UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


AARON MOHANLAL,

                Plaintiff,

v.                               Case No. 3:12-cv-1021-J-34JRK

CHRISTOPHER ARETINO,
et al.,

                Defendants.

_____

**ORDER**

**I. Status**

Plaintiff Aaron Mohanlal, a pro se inmate, initiated this action on September 14, 2012, by filing a Civil Rights Complaint (Doc. 1) pursuant to 42 U.S.C. § 1983. He filed an Amended Complaint (Doc. 39) on July 8, 2013, a Second Amended Complaint (Doc. 44) on January 29, 2014, and a Third Amended Complaint (TAC; Doc. 52) with exhibits along with a Memorandum of Law (Doc. 53) on June 10, 2014. In the TAC, Mohanlal names the following individuals as Defendants: (1) Christopher Aretino, a correctional officer employed at Suwannee Correctional Institution Annex (SCIA); (2) Albert Kinsey, a sergeant formerly employed at SCIA; and (3) Charlotte Owens, a sergeant at SCIA. TAC at 4. Mohanlal asserts that the Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment when (1) they failed to take reasonable steps to protect him from known dangers, and (2) on April 1, 2011, as a result of their deliberate indifference to his

safety, they failed to protect him from or intervene in an assault by inmate Demps and other inmates. Id. at 6-12. As relief, he requests compensatory damages as well as declaratory relief. Id. at 13-14.

This cause is before the Court on Defendants' Amended Motion to Dismiss Plaintiff's Amended Complaint (Motion; Doc. 80) with exhibits (D. Ex.). Although titled as a "Motion to Dismiss Plaintiff's Amended Complaint," in the Motion Defendants actually seek two different types of relief. In accordance with binding Eleventh Circuit precedent, Defendants seek dismissal of Mohanlal's TAC because Mohanlal failed to exhaust his administrative remedies as required by applicable law. See Motion at 6-8 (citing Bryant v. Rich, 530 F.3d 1368, 1374-75 (11th Cir. 2008) (recognizing that exhaustion is a matter in abatement "not generally an adjudication on the merits ... and is not ordinarily the proper subject of the motion for summary judgment; instead it 'should be raised in the motion to dismiss or be treated as such if raised in a motion for summary judgment'")). Alternatively, turning to the merits of Mohanlal's claim, Defendants move for summary judgment arguing that Mohanlal has failed to present evidence of a particularized threat of harm, deliberate indifference to his safety, and a causal connection between the actions about which he complains and the harms he allegedly suffered. Id. at 8-17. Additionally, Defendants argue that they are entitled to summary judgment on their defense

of qualified immunity because they did not violate Mohanlal's constitutional rights, and he identified no clearly established law regarding the constitutional right. Id. at 17–18.

Both prior to and upon receipt of the Motion the Court advised Mohanlal that the granting of a motion for summary judgment would represent a final adjudication of this case, which may foreclose subsequent litigation on the matter, and gave him an opportunity and instructions as to his burden in responding to a dispositive motion. See February 20, 2013 Order (Doc. 15) at 3–4, ¶6; Summary Judgment Notice (Doc. 72); Summary Judgment Notice (Doc. 81). On September 30, 2015, Mohanlal responded by filing Plaintiff's Reply to Defendant[s'] Amended Motion for Summary Judgment to Dismiss Plaintiff's Amended Complaint (Response; Doc. 89) with exhibits (P. Ex.). In the Response, Mohanlal contends that he (1) properly exhausted his administrative remedies, both before and after the attack, and (2) has provided evidence to show an Eighth Amendment claim because he made all Defendants aware of the security failure and the particular threats to him. Thus, the Motion is ripe for review, and the Court will address the question of whether dismissal for failure to exhaust is warranted before turning to Defendants' arguments regarding the merits of Mohanlal's claims.

**II. Facts**[1]

In his sworn TAC, Mohanlal asserts that on or about February 23, 2011, three inmates assaulted inmate Ricky Hodges (Inmate Number 132669) in the back stall area[2] of wing 1, M-dormitory. TAC at 9, ¶11. He explains that the officers on duty that day at the officers' station, including Defendant Owens, did not see the attack on Hodges because "the security mirror was turned towards the ceiling." Id., ¶12. As such, the officers became aware of the incident only when Hodges, bleeding, ran into the sleeping area. Id. In March 2011, Mohanlal spoke with Defendants Owens, Kinsey, and Aretino "at different times" and "made them aware" of three blind spots on the wing, including the back stall area, where inmates "repeatedly tampered with the security mirror in [that area] by turning the mirror toward the ceiling" to prevent the officers at the station from seeing their "illegal behavior." Id., ¶13. He complains that Defendants[3] "overlooked and ignored the

---

[1] As discussed below, because this case is before the Court on Defendants' Motion for summary judgment, the facts recited herein and all reasonable inferences therefrom have been viewed in a light most favorable to Mohanlal. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court notes that these facts may differ from those ultimately proved at trial. See Lee v. Ferraro, 284 F. 3d 1188, 1190 (11th Cir. 2002).

[2] Mohanlal describes the back stall area as "the toilet stalls in the rear of the bathroom." TAC at 8, ¶6.

[3] See Plaintiff's Reply to Defendants['] Motion to Dismiss Amended Complaint (Doc. 56) at 2, ¶10 (asserting under penalty of perjury that a "word processing error" occurred inadvertently

- 4 -

problem of inmate(s) tampering with the security mirrors" in the dormitory. Id., ¶14.

In late March 2011, inmate Donald Demps (Inmate Number 509559), a known "Booty Bandit,"[4] moved into M-dormitory next to Mohanlal's bunk. Id. at 10, ¶15. Demps allegedly told inmate Bradley Thatcher (Inmate Number N18410) that he would "smash"[5] Mohanlal if Thatcher did not perform sexual favors for Demps. Id. After Thatcher told Mohanlal about Demps' threats, Mohanlal informed Owens about the threats, and Owens "immediately moved" Thatcher to wing 2 but did not change the sleeping arrangements of Mohanlal and Demps. Id., ¶16. On several occasions before April 1, 2011, Mohanlal pleaded with Owens, Kinsey, and Aretino "for help and told them of his fear of inmate Demps, 'the devil' sleeping next to him." Id., ¶17. Mohanlal repeatedly requested that the Defendants move either one of them to a separate dormitory. Id.

On the morning of April 1, 2011, while Mohanlal was in the Quad 3 yard, Chilly Willy (an inmate housed in Wing 2, Demps'

---

excluding Aretino from this allegation, but reaffirming that all the Defendants overlooked and ignored the issue).

[4] Mohanlal describes the term "Booty Bandit" as an inmate with homosexual tendencies who preys on younger inmates for sexual favors. TAC at 10 n.2.

[5] Mohanlal explains that the term "smashing" refers to an inmate causing death or great bodily harm to another inmate. TAC at 10 n.1.

friend, also a known "Booty Bandit") told Mohanlal that "people"[6] wanted to "smash" Mohanlal because he had informed security about their illegal activities. Id. at 10-11, ¶18. Mohanlal reported the threats of violence and his fears to Aretino, but Aretino ignored his requests for help. Id. at 11, ¶¶19-20.

At approximately 12:33 p.m. on April 1, 2011, after Kinsey and Aretino completed their count procedures and most of the M-dormitory inmates had departed for lunch, Mohanlal fell asleep. Id., ¶21. Mohanlal describes what happened next as follows:

> [S]hortly after falling asleep, and although [P]laintiff's bed was in front of the officer station, [P]laintiff was "snatched/grabbed" out of bed by an inmate, who was later identified as inmate Holloway.
>
> An inmate grabbed Plaintiff around his neck, choking him while removing [P]laintiff from his bed. Plaintiff was then thrown against the water fountains that were in the dormitory and dragged into the back stall area of the bathroom[. P]laintiff saw that inmate Demps was waiting in the back stall area.
>
> After dragging Plaintiff into the "blind spot" in the back stall area, inmate Demps and his friends inflicted injuries to [P]laintiff through numerous kicks and punches before [P]laintiff lost consciousness when his head was slammed into a hard object.
>
> During this assault, [P]laintiff received lacerations to his face, head, and scalp and numerous bruises and abrasions to his arms, legs, torso, face, and head.

---

[6] Mohanlal explains that these "people" were other inmates associated with various groups or gangs within SCIA. TAC at 11 n.3.

> During the violent attack upon [P]laintiff,
> Defendant ARETINO was the only officer on duty
> in the officer's station. At no time during
> the violent attack did Defendant ARETINO
> intervene to protect [P]laintiff from being
> snatched out of bed (that was in front of the
> [o]fficer's station), dragged and beaten by
> several inmates in a known "blind spot."
>
> After the above-described assault, an inmate
> placed [P]laintiff on the steps of the officer
> station and Defendant ARETINO then notified
> medical personnel, and security of the assault
> on [P]laintiff.
>
> On April 3, 2011, while in confinement,
> Plaintiff was briefly interviewed by Defendant
> KINSEY, gave a written statement, and
> confirmed that one of the attackers was inmate
> "Demps" [to whom] Plaintiff previously
> referred to the Defendants as the "Devil[."]

Id. at 11-12, ¶¶21-27 (enumeration and footnote omitted). As a result of the attack, Mohanlal suffered blurred vision, severe headaches, frequent dizzy spells, and neck, lower back and eye pain. Id. at 12, ¶29.[7]

---

[7] In their answer, Defendants generally admit Mohanlal's description of the dormitory housing, but deny that mirrors were moved so that they could not be properly used. See Defendants' Answer and Affirmative Defenses and Demand for Jury Trial (Answer; Doc. 62) at 3, ¶¶3-12. Defendants further admit that inmate Hodges was assaulted by three inmates in the back stall area on or about February 23, 2011. Id. at ¶11. Although Defendants deny that Mohanlal informed them of Demps' threats to Thatcher about Mohanlal, they admit that Thatcher was moved to another dorm. Id. at 4, ¶16. Additionally, Defendants admit that, following his assault, Mohanlal had a hematoma with contusions near his eye and that Aretino notified medical personnel upon becoming aware of the assault. Id. at 4, ¶¶24, 26.

For his part, Aretino recalls that approximately two days before the assault, Mohanlal told him that Thatcher was having problems with Demps. D. Ex. 2 at 6. Because it was time for shift change, Aretino told Owens, and she moved Thatcher to the other side of the dormitory. Id.[8] On the day of the assault, Aretino recalls that, between 12:00pm and 1:00pm, he released the inmates for lunch, first the M2 side and next the M1 side. Id. While he cannot recall the date and time of the assault, Aretino remembers that he next put his food in the microwave in the officer's station and an inmate knocked on the window, stating that Mohanlal was lying in the bathroom. Id. at 6-7. Aretino went to the bathroom and found Mohanlal standing there with a lot of swelling to his forehead. Id. at 7. Aretino explains that when he asked Mohanlal what had happened, Mohanlal stated, "I don't know[;] all I remember [is] lying on my bed waiting for count to clear, then [I] woke up standing at the door." Id. Aretino notified Kinsey who arrived and also questioned Mohanlal. Id. Mohanlal was then escorted to medical for treatment and later housed in protective custody. Id.

The April 1, 2011 shift assignments reflect that Kinsey and Aretino worked the second shift while Owens worked the third shift.

---

[8] Aretino asserts that Mohanlal asked him to move Thatcher back to his side of the dormitory because "he was helping him with legal work[,]" but Aretino responded that Thatcher could not return. Id. However, Mohanlal denies that he made such a request. For summary judgment purposes, the Court does not consider this assertion by Aretino.

D. Ex. 1 at 12-13. The April 1, 2011 SCIA log of events for M-Dormitory notes the following: (1) at 12:30 p.m. Kinsey completed a "security safety inspection of the locking mechanisms of all doors and control panels[;]" (2) also at 12:30 p.m. Aretino conducted a security check when laundry was returned; (3) at 12:40 p.m. side M1 was released for noon meal; (4) at 12:50 p.m. side M2 was released for noon meal; (5) at 1:00 p.m. Aretino conducted a security check (6) at 1:07 p.m. side M1 returned from noon meal; (7) at 1:20 p.m. side M2 returned from noon meal; and (8) at 1:30 p.m. Aretino conducted a security check. Id. at 15-16.

After the attack, Mohanlal gave an interview to a Sergeant Pinner, in which he described the assault and named Demps, Holloway, "Chilly Willy," and Thatcher as the assailants. Response at 6, ¶12. Mohanlal explains that in the weeks and months following the attack, he filed informal and formal grievances regarding the attack and named the assailants, but received no response except a threat to stop complaining. Id. at 7-10.

Mohanlal filed his first informal grievance on April 4, 2011. D. Ex. 1 at 1. In it he challenged the personal property list submitted after the April 1 incident. Id. In his next informal grievance, dated April 10, 2011, Mohanlal asserted

> I am grieving that the Dorm M-1 is not
> properly monitored by the officers on duty.
> There are (3) blind spots in the Dorm (the
> side row along 1122L; view towards the laundry
> door; and the back stall area of the

bathroom)[.] The [i]nmates always turn the
mirror in the bathroom towards the ceiling. On
Friday 4/1/11, approx[imately l]unchtime, I
was "Smashed/Attacked" by two [i]nmates in the
backstall area. I was sleeping at the time and
was snatched, thrown against the water
fountains, dragged into the bathroom and was
brutally [a]ttacked by two [i]nmates. I had
previously brought the "mirror" situation to
the day/evening officers, to [n]o-avail. In
the past, [i]nmate Ricky Hodges was jumped in
the bathroom around the backstall area by (3)
[i]nmates, and the officers saw nothing
(Approx. Feb. 23, 2011). I thought that this
was a "safe"/Policed Camp, but I was wrong!
Inmates from Everglade get[] away with "sling"
stuff all the time. Please secure this
facility.

Id. at 2. On April 18, 2011 Grievance Officer C. Upshaw responded,

"Your grievance has been rec[ei]ved, reviewed, and evaluated. Your

allegations have been forwarded to the Inspector General's Office.

Based on the foregoing, this grievance is approved." Id.

On May 11, 2011, Mohanlal filed an Inmate Request asserting

My family came to visit me on 4/30/11 and were
very upset that the [i]nmates that [a]ttacked
me on 4/1/11 were not held accountable after
the "Investigation." When I was attacked in
M1-Dorm and went to Medical, my head was
swelling like a melon. I could not remember
who attacked[;] I was sleeping. Then after on
4/4/11, I remembered and gave a written
statement giving the names of (Demps, M11298),
(Redd), and "Chilly Willy", (Bradley Thatcher,
M21094)[.] Nothing [h]appen[ed]. I was
released on 4/27/11 from P1-Dorm and did my
[i]nvestigation. (1) eye witness (Michael
Perez, M1125U), (Timothy Simpson) (Chapel
Clerk), (Robert Plazaik) had [i]nfo, and
(Bradley Thatcher) put out on the [c]ompound
that (Demps and Halloway) were the main
[a]ttackers. I gave this new [information] to

- 10 -

the officers on 4/30/11, and was placed under a 2nd [i]nvestigation. The [a]ttackers sent word to me that "it is not over." The main reason why I was attacked is somebody gave the [i]nmates in M2-Dorm a print-out of my charges. I was told that an Officer ate a bag of chips and watched the [a]ttack. I want to press charges against all involved. I do not want to be in Protective Custody at all. I want to [p]ress charges.

Id. at 3. The Office of Assistant Warden denied the grievance on May 16, 2011, stating

RRE: An investigation was conducted by Sgt. Pinner and he stated that on 4-2-11 you were interviewed and stated you had no memory [as] to what happened to you. He interviewed you again on 4-18-11 and you could not provide any further information to aid in the inquiry. You provided a written statement on this date (4-18-11) indicating that you were not sexually assaulted. On 4-27-11 you signed a Protection Waiver/Appeal Decision form witnessed by Classification Officer M. Anderson stating you are not in fear and do not feel you need protection. [A]t no time did you provide any names therefore no one could be held accountable for assaulting you.

Id.

Mohanlal next filed a formal grievance, on May 26, 2011, seeking review of the investigation into his assault and requesting that criminal charges be brought against the offenders. Id. at 4. On May 27, 2012, Mohanlal appealed to the Florida Department of Corrections (FDOC) Secretary regarding the incomplete investigation and lack of prosecution. Id. at 6. According to the Secretary's response, the grievance was denied because the OIG lacked

- 11 -

sufficient evidence to sustain charges, and because Mohanlal had been transferred to HCI on June 10, 2011 "to resolve [his] protection needs." Id. at 5, 7.

With respect to the OIG investigation, Mohanlal avers that, on April 2, 2011, he gave a Sergeant Dickerson a written statement in which he identified Holloway and Demps as his attackers as he went through pictures of inmates. Id. On July 27, 2011, at HCI, Mohanlal claims that Inspector General Cherry recorded an interview with him. Id. at 9. Again, on August 4, 2011, Mohanlal claims he gave another recorded interview "stating in detail everything that happen[ed] prior to, and after[,] the 4/1/2011 attack, giving names of the Officers, inmates, and witness." Id. Each time, the Inspector General's office told Mohanlal to be patient and stop complaining because a complete investigation was underway. Id. Mohanlal asserts that he has never received information from the Inspector General's investigation, except a brief response to a grievance stating there was insufficient evidence to identify his assailants or establish probable cause to support any criminal or administrative action involving prison staff or inmates. Id. at 10.

## III. PLRA Exhaustion Requirements

Defendants contend that Mohanlal has not exhausted his administrative remedies, which is "a precondition to an adjudication on the merits" and mandatory under the Prison Litigation Reform Act (the "PLRA"). Bryant, 530 F.3d at 1374; Jones

v. Bock, 549 U.S. 199, 211, 127 S.Ct. 910, 918-19, 166 L.Ed.2d 798 (2007); Woodford v. Ngo, 548 U.S. 81, 85, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory.") (citation omitted). The Supreme Court has stated that "failure to exhaust is an affirmative defense under the PLRA[.]" Jones, 549 U.S. at 216, 127 S.Ct. at 921. However, "the PLRA exhaustion requirement is not jurisdictional[.]" Woodford, 548 U.S. at 101, 126 S.Ct. at 2392. See Turner v. Burnside, 541 F.3d 1077, 1082 (11th Cir. 2008) (recognizing that the defense "is not a jurisdictional matter").

Addressing this issue, the Eleventh Circuit has instructed:

> Before considering the merits of this case, we must address a threshold matter. According to 42 U.S.C. § 1997e(a), enacted as part of the [PLRA],
>
> > No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.
>
> The PLRA's effective date was April 26, 1996; because the prisoners filed their complaint after this date, the PLRA applies. Higginbottom v. Carter, 223 F.3d 1259, 1260 (11th Cir. 2000). A district court must dismiss the suit when it finds that the plaintiff-inmate has not exhausted his administrative remedies. Cf. Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000).

Chandler v. Crosby, 379 F.3d 1278, 1286 (11th Cir. 2004).

In <u>Alexander v. Hawk</u>, the Eleventh Circuit identified seven important policies favoring an exhaustion of remedies requirement:

> (1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that "frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures."

159 F.3d 1321, 1327 (11th Cir. 1998) (quoting <u>Kobleur v. Group Hospitalization & Medical Svcs., Inc.</u>, 954 F.2d 705 (11th Cir. 1992)). Notably, the Supreme Court has held that, "the PLRA exhaustion requirement requires proper exhaustion." <u>Woodford</u>, 548 U.S. at 93, 126 S.Ct. at 2387.

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the

issues on the merits)." <u>Pozo</u>,[9] 286 F.3d, at 1024.

<u>Id.</u> at 90. As such, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." <u>Id.</u> The Eleventh Circuit has not determined the extent to which imperfect compliance with administrative remedies constitutes PLRA exhaustion or whether any exceptions may apply. See <u>Goebert v. Lee Cnty.</u>, 510 F.3d 1312, 1325 (11th Cir. 2007) (declining to determine "how much less than perfect compliance" is enough).[10] Nevertheless, the court has instructed that the failure to identify a particular defendant in a grievance is not fatal. <u>Brown</u>, 212 F.3d at 1207. Rather, a

---

[9] <u>Pozo v. McCaughtry</u>, 286 F.3d 1022 (7th Cir. 2002), <u>cert</u>. <u>denied</u>, 537 U.S. 949 (2002).

[10] <u>Cf.</u> <u>Dole v. Chandler</u>, 438 F.3d 804, 811 (7th Cir. 2006) (holding that a prisoner properly exhausted his administrative remedies when the jail lost his timely grievance but the prisoner did not attempt to re-file); <u>Hemphill v. New York</u>, 380 F.3d 680, 689 (2d Cir. 2004) (recognizing "special circumstances," including reasonable but incorrect readings of the administrative procedures, sufficient and recognizing estoppel and failure to raise or preserve the defense as exceptions to the exhaustion requirement); <u>Spruill v. Gillis</u>, 372 F.3d 218, 232 (3d Cir. 2004) (holding that substantial compliance with administrative procedures was sufficient); <u>Strong v. David</u>, 297 F.3d 646, 650 (7th Cir. 2002) (holding that if applicable regulations do not prescribe any particular content, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming."); <u>see also</u> <u>Woodford</u>, 548 U.S. at 103-04, 126 S.Ct. at 2393 (Breyer, J., concurring) (recognizing that § 1997e(a) requires proper exhaustion, but suggesting that traditional exceptions to administrative exhaustion also apply).

prisoner is only required to provide "as much relevant information as he reasonably can in the administrative grievance process." Id.

Notably, prisoners are not required to plead or demonstrate exhaustion in their complaints. Jones, 549 U.S. at 216, 127 S.Ct. at 921 ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."). Instead, as stated in Jones, failure to exhaust is an affirmative defense, and as such, a defendant bears the burden of establishing that failure. See Turner, 541 F.3d at 1082-83. The Eleventh Circuit has directed courts to use a two-step analysis to determine whether a complaint should be dismissed for failure to exhaust administrative remedies. Bryant, 530 F.3d at 1374.

> First, the court looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true. ... If the complaint is not subject to dismissal at the first step, where the plaintiff's allegations are assumed to be true, the court then proceeds to make specific findings in order to resolve the disputed factual issues related to exhaustion. ... The defendants bear the burden of proving that the plaintiff has failed to exhaust his available administrative remedies. ... Once the court makes findings on the disputed issues of fact, it then decides whether under those findings the prisoner has exhausted his available remedies.

Turner, 541 F.3d at 1082-83 (citations omitted). Consistent with this authority the Court is permitted to consider materials outside

the pleadings and resolve factual disputes regarding exhaustion so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record. Bryant, 530 F.3d at 1376.

Defendants argue that Mohanlal did not fully and properly exhaust the available administrative remedies because (1) he did not submit any grievances prior to the assault, (2) his grievances did not mention all of the defendants, and (3) none of Mohanlal's appeals referenced the security mirrors. Motion at 7-8. Upon review of the factual allegations in the TAC, the Motion, and the Response, assuming Mohanlal's allegations are true, the Court finds that Mohanlal's claims are not subject to dismissal for failure to exhaust. Turner, 541 F.3d at 1082-83.

Preliminarily, the Court notes that Mohanlal alleges that he exhausted his administrative remedies. See TAC at 7-10. More importantly, the parties do not really disagree as to the facts regarding his efforts at exhaustion. Indeed, both Mohanlal and Defendants provide copies of grievances submitted by Mohanlal regarding the misuse of the mirror, the alleged attack, his loss of property, and Mohanlal's frustration with the subsequent investigation. See D. Ex. 1 at 1-11; P. Ex. A at 1-2, 6-12, C at 1-3. As quoted above, Mohanlal grieved his security concerns, the assault, and the subsequent investigation. His April 10 grievance, which specifically addresses his security concerns and the assault,

was "approved," and Mohanlal was informed that an investigation was ongoing. D. Ex. 1 at 2; P. Ex. A at 2. Having advised Mohanlal that his grievance was approved and the matter was being investigated by the OIG, Defendants fail to explain how prison rules required, or even permitted, Mohanlal to appeal the matter, or proceed further with the grievance.

The Florida Administrative Code provides that an approval of a grievance allows a warden or his representative to grant and implement appropriate relief. R. 33-103.015(3), Fla. Adm. Code. Defendants do not point to any procedure, mechanism, or requirement for a prisoner to appeal an approved grievance. Rather, if a prisoner is dissatisfied with the response, he or she may file a formal grievance within 15 days of receiving the response. R. 33-103.006, Fla. Adm. Code. Because the April 10 grievance was approved, there was no further available remedy, especially considering that any appeal had to be filed within fifteen days of the grievance approval, a time during which the promised investigation would have been ongoing.

Nevertheless, when Mohanlal did not receive any findings from the Inspector General, he filed additional grievances regarding the investigation. D. Ex. 1 at 3-7, 9. These grievances were rejected because the matter had previously been reported. See id. Indeed, in response to the May 26, 2011 appeal to the Warden, prison officials advised Mohanlal that the matter was being investigated and "[i]f

- 18 -

the allegations are substantiated, appropriate action will be administered by the Office of the Inspector General." D. Ex. 1 at 5. While the response advised Mohanlal of his right to appeal, the substance of the response suggested that based on the previous grievance prison officials were doing exactly as requested - conducting an investigation at the conclusion of which any party found culpable would be held accountable. Later, when he received no findings from the OIG, Mohanlal appealed to the Warden, see id. at 6, but that appeal was returned without action in part as untimely filed. Id. at 7.

Defendants' arguments regarding Mohanlal's failure to exhaust are unavailing because they do not address the approval of Mohanlal's April 10 grievance. Instead, Defendants focus on other grievances regarding issues only tangentially related to this action such as smoking, and Mohanlal's loss of personal property. Moreover, the Court declines to accept Defendants' suggestion that Mohanlal was required to completely grieve his security concern before he had been attacked. Defendants cite no authority supporting this contention. The PLRA requires exhaustion of administrative remedies prior to filing suit, not exhaustion before an inmate is suddenly attacked.

In his April 10 grievance, Mohanlal identified the security concerns related to his assault including the mirrors, stated that he had advised the "day evening officers" of the concern, and gave

the time, date, and description of the assault. Mohanlal provided sufficient relevant information following the incident and, after not receiving information on the investigation, filed further grievances and appeals. Defendants have failed to show that this was not proper exhaustion. Thus, the Court finds that Mohanlal's suit is not subject to dismissal under the PLRA.

### IV. Summary Judgment on the Merits of Plaintiff's Claims

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[11] An issue is genuine when the evidence is such that

---

[11] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review

a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004). The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (per curiam) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91

remains viable and is applicable here.

L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994) (per curiam)).

## V. Law and Conclusions

Mohanlal's Eighth Amendment claims are two-fold. He asserts that Defendants (1) failed to protect him after he advised them of security weaknesses and repeated specific threats to his life, and (2) failed to intervene in the April 1, 2011 attack.

### A.   Eighth Amendment Violation

The Eleventh Circuit has explained the requirements for an Eighth Amendment violation:

> The Eighth Amendment "imposes a duty on prison officials" to "take reasonable measures to guarantee the safety of the inmates." <u>Caldwell v. Warden, FCI Talladega</u>, 748 F.3d 1090, 1099-100 (11th Cir. 2014) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (quotation marks omitted and alterations adopted)). In particular, under the Eighth Amendment, "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." <u>Farmer</u>, 511 U.S. at 833, 114 S.Ct. at 1976 (quotation marks omitted and alterations adopted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." <u>Id.</u> at 834, 114 S.Ct. at 1977.

A prison official violates the Eighth Amendment "when a substantial risk of serious harm, <u>of</u> <u>which</u> <u>the</u> <u>official</u> <u>is</u> <u>subjectively</u> <u>aware</u>, exists and the official does not respond reasonably to the risk." <u>Carter v. Galloway</u>, 352 F.3d 1346, 1349 (11th Cir. 2003) (quotation marks omitted and alterations adopted) (emphasis added). ...

"The second element - that [a prison official] evidenced a deliberate indifference to a serious risk that [a prisoner] would be injured - forms the crux of the matter at hand." <u>Id.</u> The prison official must "actually (subjectively) know[] that an inmate is facing a substantial risk of serious harm, yet disregard[] that known risk by failing to respond to it in an (objectively) reasonable manner." <u>Rodriquez v. Sec'y for Dep't of Corr.</u>, 508 F.3d 611, 617 (11th Cir. 2007). With regard to the subjective component of the defendant's <u>actual</u> <u>knowledge</u>, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837, 114 S.Ct. at 1979.

Moreover, this must be shown by "conduct that is more than gross negligence." <u>Townsend v. Jefferson Cnty.</u>, 601 F.3d 1152, 1158 (11th Cir. 2010). "[T]he deliberate indifference standard - and the subjective awareness required by it - is far more onerous than normal tort-based standards of conduct sounding in negligence: 'Merely negligent failure to protect an inmate from attack does not justify liability under [§] 1983.'" <u>Goodman</u>,[12] 718 F.3d at 1332 (quoting <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537 (11th Cir. 1990)).

<u>Losey v. Thompson</u>, 596 F. App'x 783, 788-89 (11th Cir. 2015).

---

[12] <u>Goodman v. Kimbrough</u>, 718 F.3d 1325 (11th Cir. 2013).

The Supreme Court has identified three ways that prison officials may avoid Eighth Amendment liability for failure to protect an inmate: (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger;" (2) "that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent;" or (3) that "they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844, 114 S.Ct. at 1982-83. A prisoner need not show that he was particularly susceptible to assault by a specific prisoner to put prison officials on notice; rather "[t]he question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health." Id., 511 U.S. at 843, 114 S.Ct. at 1982 (internal citation omitted). The test for causation is satisfied where prison officials have access to, but disregard, means reasonably available to protect the prisoner or avert the dangerous situation. Rodriquez, 508 F.3d at 622.

Defendants argue that Mohanlal failed to show (1) a particularized threat of harm, (2) deliberate indifference by Defendants to a substantial risk to Mohanlal's safety, or (3) that Defendants' actions caused Mohanlal harm. Defendants separately argue that they were not in a position to intervene during the

attack. With regard to the failure to intervene claim, Mohanlal concedes that Aretino was the only Defendant in the dormitory at the time of the assault.[13] Therefore, neither Kinsey nor Owens can be liable for failure to intervene because they were not present at the time of the attack, and thus they were not in a "position to intervene" to prevent or stop the assault. <u>Ensley v. Soper</u>, 142 F.3d 1402, 1407 (11th Cir. 1998); <u>Terry v. Bailey</u>, 376 F. App'x 894, 896 (11th Cir. 2010) (per curiam). As for Aretino, Mohanlal has provided evidence that Aretino was in the dormitory at the time of the attack, and Aretino does not dispute this assertion. Indeed, Mohanlal asserts that Aretino did not intervene to protect him when he was snatched from his bunk, which was directly in front of the officer's station. P. Ex. B at 5. However, Mohanlal does not specifically allege that Aretino saw him hit the water fountain or saw any other part of the assault.[14]

---

[13] Owens asserts that she had little interaction with Mohanlal and was not present at the time of the assault because her shift did not begin that day until 4:00pm. D. Ex. 2 at 1-3. Kinsey asserts that he had no contact with Mohanlal prior to the assault and that, at the time of the assault, he "was in the chow hall[] watching the [trays coming] out of the serving [l]ine window." <u>See</u> Affidavit of A. Kinsey, D. Ex. 1 at 19, ¶4. As Mohanlal does not dispute that neither of these Defendants were present, the Court accepts that neither was in a position to intervene.

[14] Mohanlal disputes Aretino's contention that he found Mohanlal standing in the bathroom, alleging that an inmate placed him at the steps of the officer's station rather than Aretino finding him in the bathroom. <u>Id.</u> at 6. However, this dispute is not material to the question of whether Aretino was aware of the attack at a time when he could intervene to stop it.

Aretino avers that he first learned of the assault on Mohanlal after it had concluded when an unknown inmate advised him that Mohanlal was injured. See D. Ex. 2 at 6-7. In the face of this sworn testimony, Mohanlal points to no evidence that Aretino was in or near the back stall area at the time of the attack or that he had any knowledge that the attack was ongoing.[15] Thus, summary judgment will be granted in favor of all Defendants regarding Mohanlal's failure to intervene claim.

Turning to Mohanlal's failure to protect claim, Mohanlal has provided evidence a particularized threat to him and of Defendants' subjective awareness of a substantial risk of serious harm to Mohanlal. Rodriquez, 508 F.3d at 621 (finding prison officials had

---

[15] In some of his grievances, Mohanlal makes vague references based on information from unidentified third parties that Aretino may have directed or watched the attack. Notably, Mohanlal has made no showing that this unsworn evidence is admissible as presented, or could be presented in an admissible form at trial. See Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003); see also Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." (internal quotations omitted)); Rule 56, Advisory Committee Notes to 2010 Amendments, Subdivision (c)(2) ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."). Moreover, while Mohanlal included this allegation in at least one of his grievances, he did not make the allegation under oath in his sworn TAC or in his verified Response. In the face of Aretino's sworn statement that he was not aware of the attack until afterward, this statement, found only in Mohanlal's unsworn grievances, constitutes no more than a scintilla of evidence that is insufficient to give rise to a genuine issue for trial on Mohanlal's claim that Aretino failed to intervene in the attack.

subjective knowledge of danger to inmate because he provided specific information regarding threats by his former gang members); cf. Carter, 352 F.3d at 1349-50 (finding prison officials had no subjective knowledge of threats to inmate because inmates' complaints were too vague and attack instead appeared to be random). Specifically, in his verified TAC, Mohanlal states that he told each Defendant, of at least two separate threats of serious harm made against him by Demps and Chilly Willy, including one on the morning of the assault. TAC at 7-11. Further, Mohanlal has provided evidence that Defendants were aware of a February 23, 2011 attack on Hodges in the back stall area, and of the fact that the security mirrors were frequently turned up, creating an even more dangerous situation. Id. at 8-10; D. Ex. 1 at 3. Additionally, Mohanlal states in his verified Response that he complained to each Defendant about the security issues with the mirrors. Response at 2. While Mohanlal's claims about the inmate's turning the security mirrors so that they did not allow a line of sight into the bathroom may not, independently, form the basis for a constitutional violation, the security mirrors are only one part of the dangerous situation Mohanlal contends he faced, which included specific threats of harm directed to him. Taken as a whole, Mohanlal has presented sufficient evidence to create a genuine issue for trial on the question of whether Mohanlal faced a

particularized threat and whether Defendants had subjective knowledge of a serious threat against Mohanlal.

Moreover, although Defendants assert that the bathroom was not a location where violence and terror reigned, see Motion at 16, Mohanlal provided evidence that the back stall area was a place where illegal activity frequently occurred, including the February 23, 2011 attack on Hodges. In fact, Mohanlal provided evidence of the prior attack in that area and that he was threatened because he made Defendants aware of this dangerous location and the problems with the security mirrors. D. Ex. A at 3. This further creates a factual dispute regarding the Defendants' subjective knowledge of the danger to Mohanlal.[16]

The Court next turns to the question of whether the Defendants' actions (or inaction) caused Mohanlal harm. On this issue, Thatcher's transfer in response to Mohanlal's earlier complaint could be viewed as evidence that the Defendants had the ability to address dangers such as those about which Mohanlal warned. Indeed, after Demps' made threats regarding Mohanlal and Thatcher, Owens transferred Thatcher to another housing location. A reasonable jury could conclude that such action reflects both a

---

[16] Defendants' argument that Mohanlal demonstrated a lack of concern because he took a nap is also not persuasive. Indeed, Mohanlal explains that he was taking a nap because he has sleep apnea and takes medications. TAC at 11 n.4. Defendants' contention as to how a jury might view the fact of Mohanlal taking a nap simply identifies a factual dispute for resolution by a jury.

subjective knowledge of the danger and an ability to respond to it. The transfer of Thatcher does not however, as Defendants contend, lead to the inescapable conclusion that Mohanlal was no longer in danger as Mohanlal was still housed with Demps.

In view of Mohanalal's sworn allegations and Thatcher's transfer a jury could conclude that the Defendants knew of ways to address the danger to Mohanlal but declined to do so. Rodriquez, 508 F.3d at 619-20 (finding that prison officials did not respond reasonably to threats against inmate where, although lacking ultimate authority to transfer, they could begin process for protective transfer). Thus, a reasonable jury could conclude that the Defendants' inaction caused Mohanlal's injuries because the Defendants were in a position to take steps to avert the April 1, 2011 attack but failed to do so.[17] Id. at 622.

In sum, the parties provide significantly different accounts of Mohanlal's requests to Defendants to be transferred and his description of relevant threats of physical violence. Upon review of the record, the Court concludes that there remain genuine disputes of material fact with respect to Mohanlal's Eighth Amendment claim against Defendants regarding the failure to protect

---

[17] Although Owens did not arrive at SCIA until later in the day on April 1, 2011, viewing the facts in the light most favorable to Mohanlal, a jury could conclude that her prior, subjective knowledge of the danger still created a duty to take objectively reasonable steps to protect Mohanlal before the attack.

him, and, as such, Defendants' Motion (Doc. 80) with respect to the merits of this claim is due to be denied.

### B.   Qualified Immunity

Defendants also contend that they are entitled to qualified immunity with respect to Mohanlal's Eighth Amendment failure to protect claim. See Motion at 17-18. "Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As a result, the qualified immunity defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'" Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003). Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler County, Ala., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

In order to be entitled to qualified immunity, an official must first establish that his conduct was within the scope of his discretionary authority. See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007) (per curiam); Lee, 284 F.3d at 1194. In the

instant action, the parties do not dispute that Defendants were acting within their discretionary authority while working at SCIA.[18] Accordingly, the burden shifts to Mohanlal to demonstrate that qualified immunity is not appropriate using the two-prong test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001). The first inquiry is, taken in the light most favorable to the non-moving party, "do the facts alleged show the officer's conduct violated a constitutional right?" Id.; see also Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting Scott v. Harris, 550 U.S. 372, 377 (2007)). If the court finds that a violation of a constitutional right has been alleged based on the plaintiff's version of the facts, then the next question is whether the right was clearly established at the time of the violation.[19] Saucier, 533 U.S. at 201, 121 S.Ct. at 2156; Scott, 550 U.S. at 377, 127 S.Ct. at 1774; Lee, 284 F.3d at 1194. The court must undertake this second inquiry "in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201, 121 S.Ct. at 2156.

---

[18] "'A government official acts within [his] discretionary authority if the actions were (1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority.'" Jones v. City of Atlanta, 192 F. App'x 894, 897 (11th Cir. 2006) (per curiam).

[19] In Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808 (2009), the Supreme Court modified the procedure mandated in Saucier permitting trial judges the discretion to determine which prong of the qualified immunity analysis should be resolved first. See Pearson, 555 U.S. at 236, 129 S.Ct. at 818.

As discussed above, viewing the facts in the light most favorable to Mohanlal as the Court must, genuine issues of material fact are present with respect to whether Defendants exhibited deliberate indifference to a serious risk of harm of which they were subjectively aware and whether such action or inaction was the cause of harm to Mohanlal. Indeed, according to Mohanlal's version of the facts, Defendants refused to respond to protect Mohanlal's safety despite knowledge of an attack on another inmate, the dangerous situation created in part by the inmates' ability to adjust the security mirrors to obstruct any view to the back stall area, and specific threats involving Mohanlal - threats serious enough to cause Defendants to transfer inmate Thatcher for Thatcher's protection. With this knowledge, Defendants failed to take any steps to protect Mohanlal's safety. Viewing the disputed evidence in the light most favorable to Mohanlal, the Court determines that, for purposes of summary judgment, Mohanlal has provided sufficient facts to support a violation of his Eighth Amendment right to be free from cruel and unusual punishment.

Next, the Court must determine whether the law was clearly established at the relevant time period. "[T]he eighth amendment's proscription against cruel and unusual punishment imposes a duty to provide reasonable protection" when a prison official becomes "aware of a threat to an inmate's health and safety." <u>Brown</u>, 894 F.2d at 1537. When prison officials are "deliberately indifferent

to a known danger ... their failure to intervene offend[s] 'evolving standards of decency' [and] ris[es] to the level of a constitutional tort. Id. (citing Estelle v. Gamble, 429 U.S. 97, 105-06, 97 S.Ct. 285, 291-92, 50 L.Ed.2d 251 (1976)). Indeed, the Eighth Amendment right of prisoners to be free of deliberate indifference by prison officials resulting in harm was clearly established at the time of the events in this case. See Hudson v. McMillian, 503 U.S. 1, 8, 112 S.Ct. 995, 999-1000, 117 L.Ed.2d 156 (1992). In light of this precedent, Defendants were on notice that failing to respond to a known threat to Mohanlal's safety was unlawful. While Defendants may argue that there is no specific precedent establishing that their conduct would violate Mohanlal's rights, "there need not be a case 'on all fours,' with materially identical facts, before we will allow suits against them." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004). Thus, at this time, Defendants are not entitled to qualified immunity.[20]

---

[20] The Court recognizes that at this stage, it must view the facts in the light most favorable to Mohanlal. This does not preclude Defendants from raising the qualified immunity defense at a later date after the jury makes relevant factual determinations. Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 925 n.3 (11th Cir. 2000).

Therefore, it is now

**ORDERED:**

1.    Defendants' Motion (Doc. #80) is **GRANTED** to the extent Mohanlal brings a claim for failure to intervene in the April 1, 2011 attack, which is dismissed with prejudice. Judgment to that effect will be withheld pending adjudication of the action as a whole. See Rule 54.

2.    Defendants' Motion (Doc. #80) is **DENIED** in all other respects.

3.    This case is referred to the Honorable James R. Klindt, United States Magistrate Judge, to conduct a settlement conference.

4.    The **Clerk** shall keep this case **ADMINISTRATIVELY CLOSED** pending the outcome of the settlement conference.

**DONE AND ORDERED** at Jacksonville, Florida this 6th day of January, 2016.

MARCIA MORALES HOWARD
United States District Judge

tc 12/23

c:

Aaron Mohanlal

Counsel of Record

- 34 -